## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **ZACHARY FREEMAN** | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | CIVIL ACTION FILE NO. |
| v. | ) | |
| | ) | |
| **Google Inc., Google Fiber, Inc.,** | ) | |
| **Google Fiber North America, Inc.,** | ) | |
| **Google Fiber Georgia LLC, GOOGLE)** | | |
| **FIBER GEORGIA, LLC, and Zenith** | ) | |
| **Talent Corporation (DBA** | ) | |
| **Crowdstaffing and DBA Prosperix)** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| *Defendant*. | ) | |

## <u>COMPLAINT</u>

Plaintiff Zachary Freeman ("Plaintiff") sets forth the following Complaint for damages against Defendants (1) Google Inc. ("Google"), (2) Google Fiber, Inc. ("Google Fiber"), (3) Google Fiber North America, Inc. ("Google Fiber NA"), (4) Google Fiber Georgia LLC ("Google Fiber GA"), (5) GOOGLE FIBER GEORGIA, LLC ("GOOGLE FIBER GA") and (6) Zenith Talent Corporation D/B/A both Crowdstaffing and Prosperix ("Zenith").

## INTRODUCTION

1.     This action is for ADA discrimination and retaliation arising under the Americans with Disabilities Act of 1990 ("ADA") as amended. Plaintiff seeks declaratory and injunctive relief, back pay, front pay, compensatory damages, punitive damages, and attorney's fees and costs.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the present matter pursuant to 28 U.S.C. § 1331.

3.     Venue is appropriate in this Court as, upon information and belief, the events complained of herein occurred within the geographic boundaries of the U.S. District Court for the Northern District of Georgia, and upon information and belief, all parties to this action reside within the geographic boundaries of the United States District Court for the Northern District of Georgia. Venue is proper pursuant to 28 U.S.C. § 1391 (b) and (c).

## PARTIES

4.     Plaintiff is a former employee of Defendants.

5.     Defendants are a series of foreign corporations all upon information and belief owned by Alphabet Inc. the parent company of Google.  Each of the Defendants are registered to conduct business in the state of Georgia.

6.     Defendants have created a confusing cluster of shell companies to hide the identity of Plaintiff's employers.

7.     Defendants each may be served through their registered agents if service of process is not waived.

8.     This Court has personal jurisdiction over Defendants.

## ADMINISTRATIVE PROCEEDINGS

9.     Plaintiff timely filed a series of four Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against the Defendants.

10.    On July 15, 2024, the EEOC issued Plaintiff his first notice of right to sue against Google Fiber.

11.    Thereafter on the EEOC issued right to sue letters against the other Defendants all of whom operate in cooperation and coordination with each other.

12.    Each Defendant was aware of Plaintiff's EEOC charge and had an opportunity to investigate Plaintiff's EEOC allegations and respond to the EEOC.

13.    Plaintiff has exhausted his administrative remedies prerequisite to the filing this suit against each of the Defendants.

14.    Suit has been filed within 90 days of Plaintiff's receipt of all his notice of right to sue notices.

## JOINT EMPLOYER STATUS

15.    All the Google and Google Fiber corporations are subsidiaries of Alphabet Inc., a multinational technology company and operate in coordination with each other.

16.    Zeneth, Crowdstaffing, and Prosperix are all different names for of the same staffing agency whom upon information and belief is also owned by Alphabet, and supplies labor to Google and Google Fiber.

17.    All of the Defendants are employers within the meaning of the ADA.

18.    Plaintiff was hired on or about March 20, 2023, as Technical Writer.

19.    Plaintiff was hired through Zenith who does business as both Crowdstaffing and as Prosperix.

20.    Zenith is a temporary staffing agency contracted to provide staffing for Defendant Google and the Google Fiber entities.

21.    It is unclear if there is any distinction between the Google Fiber entities or if so how they are different.

22.    Plaintiff was jointly employed by each of the Defendants.

23.    Upon information and belief, all the Defendants had authority to exercise control over the terms and conditions of Plaintiff's employment, specifically but not

limited to job assignments, hours, pay, benefits, promotional opportunities, and each had the ability to hire and fire.

24.    Defendants all contract with each other for the performance of some tasks, and Google and the Google Fiber entities each retain sufficient control over the terms and conditions of Plaintiff's employment such that they are "joint employers." See *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1359-60 (11th Cir. 1994).

25.    Alternatively, Google, and the Google Fiber entities has delegated sufficient control of some traditional rights over its employees to Zenith such that Zenith may be considered an agent of Google. This is called the "agency test." See *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1341 (11th Cir. 1999).

26.    Plaintiff's direct superiors, Kelli Pardo ("Ms. Pardo") and Denise Winkfield ("Ms. Winkfield") were employees of Google who were managing a project at Google Fiber, and who worked for one of the Google Fiber entities, not Zenith.

27.    Plaintiff's laptop was provided by Google/Google Fiber and Plaintiff's email was a google.com address.

28.    Google placed Plaintiff on a PIP, indicating that they were in control of his assignments and performance management.

29.    Plaintiff's interactions with Zenith were minimal, and when Plaintiff complained about his treatment to Zenith, they simply acted as a middleman to Google, who made the actual decisions about his day-to-day work.

30.    Google required that Plaintiff log each minute of his workday per task, again showing that they controlled his assignments and performance expectations.

## FACTUAL ALLEGATIONS

31.    In 2019, Plaintiff was diagnosed with depression, anxiety, and PTSD.

32.    Plaintiff was responsible for updating and creating new content for the Google Fiber knowledge base as well as creating presentations and assisting with the training of new hires.

33.    Plaintiff received almost no training for his role after he was hired.

34.    Soon after he was hired, he attended an in-person event at the Atlanta office and contracted Covid, which caused him to begin to suffer an accelerated heart rate.

35.    After Plaintiff asked for help getting access to all of the tools required for his job and to get up to speed on best practices for completing tasks, he was berated by Ms. Pardo in a call where she yelled at him that "we have trained you."

36.    Ms. Winkfield was on that call and backed up Plaintiff's assertion that he did not have access to the necessary tools for his job.

37.    In April 2023, the rest of the technical writing team had their contracts ended, leaving Plaintiff as the only technical writer.

38.    Plaintiff then attempted to spend a week with another team member, "Allysa," shadowing her. Allysa also created an unofficial guide for Plaintiff on how to do his job.

39.    During one call with Allysa, Ms. Pardo interrupted the call, telling Plaintiff not to waste any more of her team's time.

40.    When Plaintiff pointed out that Alyssa was no longer receiving tickets and had time to help him, Ms. Pardo yelled at him to do the work himself.

41.    In May 2023, Ms. Pardo began to take issue with Plaintiff taking time off for doctors' appointments, demanding that he tell her why he was going to the doctor and that he put his appointments on the company calendar, which was against Google policy.

42.    Shortly after this began, Plaintiff began to see tickets come in that were poorly explained or not explained at all, and Ms. Pardo told Plaintiff that he could not reach out to subject matter experts and that he just had to "work the ticket."

43.    Plaintiff also noticed that many of the tickets he pushed through for approval were left unapproved by Ms. Pardo past their deadlines, even if Plaintiff completed the ticket on time.

44.    Ms. Pardo began micromanaging Plaintiff's work even more, making him restart tickets.

45.    On or about July 26, 2023, after receiving a ticket that was poorly written, Ms. Pardo screamed at Plaintiff. This screaming triggered Plaintiff's PTSD, and as a result, he suffered a panic attack.

46.    Plaintiff let Zenith know about his diagnosis and the panic attack, detailing what happened with Ms. Pardo and why it triggered his PTSD as well as other examples of the hostile work environment created by Ms. Pardo.

47.    These examples included systemic issues with poor communication, training, and barriers to institutional knowledge.

48.    Further, Plaintiff sent screenshots and other evidence that his communications to Ms. Pardo were often completely ignored.

49.    Between August 7 and 11, 2023, Zenith arranged a mediation with Google HR between Plaintiff and Ms. Pardo.

50.    In that meeting, Plaintiff tried to explain that he wanted to do his job well but that he needed the yelling and abusive behavior to stop.

51.    At that time, HR made the decision to separate Plaintiff and Ms. Pardo.

52.    On or about August 17, 2023, Plaintiff was informed by Zenith that he had failed a PIP that he was not even aware existed.

53.    The PIP claimed that Plaintiff was setting his status to away and did not have his camera on, even though it was his experience and belief that many employees did not use their camera, particularly since there were often issues with the camera and presentations running on laptops at the same time.

54.    In the PIP, Plaintiff was told that he had to write a report of what he had done every 30 minutes throughout the day.

55.    The PIP was also set up so that Ms. Pardo had control of whether or not Plaintiff's tickets were marked as completed, and because she was leaving his tickets in an unapproved status, there was no way for him to meet the conditions of the PIP.

56.    Between August 18 and 21, 2023, Plaintiff tries to explain his belief that the PIP was issued in retaliation for his reports to HR about Ms. Pardo's behavior.

57.    Plaintiff wrote a response with screenshots refuting the allegations that he was not doing his job well, showing that any feedback he received from employees other than Ms. Pardo was positive and that he'd never received any warning about his performance.

58.    Plaintiff declined the sign the PIP and informed Google that he was looking at filing a claim with the EEOC.

59.    Plaintiff also documented several days of work, showing that Ms. Pardo did not respond to work-related communications, did not approve his completed tickets, and that he was online and active during the work day.

60.    Plaintiff sent this documentation to Zenith and Google HR.

61.    After this documentation, Plaintiff's PIP was canceled and he was moved under the supervision of Sarah Ridley ("Ms. Ridley"), the Head of Customer Service.

62.    Plaintiff was also given direct access to subject matter experts as well as written training materials.

63.    However, beginning in late August, Plaintiff begins to get emails including the monitoring that was included in the PIP, particularly when he had to take time off for a second bout of Covid.

64.    Plaintiff provided documentation from his physician about absences needed in order to recover.

65.    Plaintiff also pointed out that if the PIP was canceled, they could not continue to require the monitoring that was in the PIP.

66.    At one point, Plaintiff's timesheet was rejected, which caused his pay to be delayed.

67.    Eventually, in mid-September, Defendant backed off the monitoring and reporting requirements.

68.    On or about September 15, 2023, Plaintiff asked several times for the ADA accommodation form to engage in the iterative process for reasonable accommodations.

69.    Plaintiff had his therapist complete the form, which was rejected by Defendant for his accommodations being "too broad," so Plaintiff had his therapist complete the form a second time with more narrowly defined accommodations on or about October 12, 2023.

70.    Between mid-September and mid-October 2023, Plaintiff performed well under the supervision of Ms. Ridley.

71.    Plaintiff helped the team get two months ahead of production, completed several major projects, and began to take on management responsibilities including weekly presentations on the team's progress as well as training new hires.

72.    Ms. Winkfield and other team members praise Plaintiff's work.

73.    On or about October 23, 2023, Plaintiff's ADA accommodations requests was finally processed.

74.    However, on the same day, Plaintiff received a call from Prosperix, another d/b/a of Zenith, stating that Google was canceling the contract and that his last day of employment would be November 3, 2023.

75.    During this time, Ms. Ridley, Plaintiff's new supervisor, was out of the office on FMLA and was unaware of these actions.

76.    Plaintiff attempted to find out why the contract was canceled but his coworkers and supervisors appeared to be completely unaware of his termination.

77.    Defendant claims that Plaintiff was terminated because they no longer "had a business need for temporary staffing support."

78.    However, on or about October 30, 2023, Plaintiff received a call from a recruiter to hire him for the job he was already in. The recruiter confirmed that the client was Google Fiber and that the job descriptions were identical, showing that Defendant's claim that the work was no longer necessary is pretextual.

79.    Plaintiff believed that, instead, he had been terminated due to her complaints about Ms. Pardo and about his ADA requests.

## COUNT I

## VIOLATION OF ADA

80.    Plaintiff incorporates by refence each and every preceding paragraph of this Complaint.

81.    Plaintiff had a disability as defined by the ADA.

82.    As detailed above, Plaintiff notified Defendant of his disability and asked for accommodations after suffering from a recurrence of PTSD and panic attacks due to Ms. Pardo's abusive behavior.

83.    Defendant claims that Plaintiff never requested accommodations; however, Plaintiff submitted his first accommodation request on or about September 15, 2023, and his second request on or about October 12, 2023. His ADA accommodations were approved on October 23, 2023, the same day he was notified that his contract was ending, ensuring that Defendant would not have to honor those accommodations.

84.    Defendant's actions violated the ADA.

85.    As a direct and proximate result of Defendant's intentional discrimination, Plaintiff has suffered damages, including but not limited to lost pay, job benefits, emotional distress, and all other damages allowed by law.

## COUNT II

## RETALIATION

86.    Plaintiff hereby incorporates each and every preceding paragraph as if set forth fully herein.

87.    Plaintiff engaged in protected activity under the ADA.

88.    As detailed above and in response, Defendant retaliated against Plaintiff.

89.    Specifically, Plaintiff was retaliated against when Plaintiff was (1) forced to put private medical appointments on the company calendar in direct violation of Defendant's own policy; (2) repeatedly berated and put on a PIP by Ms. Pardo; and (3) terminated via the ending of his contract within weeks of his submission of an ADA accommodations form.

90.    Defendant's actions constitute unlawful retaliation in violation of all the above cited statues.

91.    Defendant willfully and wantonly disregarded Plaintiff's rights and Defendant's retaliation against Plaintiff was undertaken intentionally and in bad faith.

92.    As a result of Defendant's unlawful actions, Plaintiff has suffered lost compensation and other benefits of employment, significantly diminished employment opportunities, emotional distress consisting of, but not limited to, outrage, shock, and humiliation, inconvenience, loss of income, and other indignities.

WHEREFORE, Plaintiff demands a trial by jury and for the following relief:

(a)    a declaratory judgment that Defendants have engaged in unlawful employment practices in violation of the ADA;

(b)    an injunction prohibiting Defendants from engaging in unlawful employment practices in violation of the ADA;

(c)    full back pay from the date of Plaintiff's constructive termination, taking into account all raises to which Plaintiff would have been entitled but for his unlawful termination, and all fringe and pension benefits of employment, with prejudgment interest thereon;

(d)    front pay to compensate Plaintiff for lost future wages, benefits, and pension;

(e)    compensatory damages, in an amount to be determined by the enlightened conscience of the jury, for Plaintiff's emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life and special damages;

(f)    punitive damages in an amount to be determined by the enlightened conscious of the jury to be sufficient to punish Defendants for its conduct toward Plaintiff and deter it from similar conduct in the future;

 (g)    reasonable attorney's fees and costs; and

 (h)    nominal damages and any other and further relief as the Court deems just and proper.

Respectfully submitted this 13th day of October, 2024.

/s/ J. Stephen Mixon
J. Stephen Mixon
Georgia Bar No. 514050
steve@mixon-law.com
Attorneys for Plaintiff

THE MIXON LAW FIRM
3344 Peachtree Rd. Suite 800
Atlanta, GA 30326
Telephone: (770) 955-0100
Facsimile: (678) 999-5039